IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| WENDY MARIE MORRISON, ) | CASE NO. 10-10365 |
| ) | |
| ) | |
| Debtor. ) | Chapter 7 |
| ) | |

## MEMORANDUM OPINION

On May 28, 2010, the United States Bankruptcy Administrator (the "BA") filed a motion seeking to have this case dismissed pursuant to Section 707(b)(1) and (b)(3) of the Bankruptcy Code on the grounds that the case constitutes an abuse of the provisions of Chapter 7 based upon bad faith or the totality of the circumstances of the Debtor's financial situation. On September 24, 2010, both the BA and the above-referenced debtor (the "Debtor") filed a Motion for Summary Judgment, solely on the issue of the household size of the Debtor. These matters came before the Court on October 7, 2010. Robert E. Price, Jr. appeared on behalf of the BA, and Erik M. Harvey appeared on behalf of the Debtor.

### I. JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) which this Court has the jurisdiction to hear and determine.

### II. FACTS

1

On February 26, 2010, the Debtor filed her Chapter 7 bankruptcy petition. Schedule A indicates that the Debtor owns a condominium in Greensboro, North Carolina, that she intends to surrender.[1] Schedule F reflects $52,175.80 in unsecured debt.

Schedule I indicates that the Debtor is a supervisor at CarMax, with monthly gross income of $3,930.16. After payroll taxes and Social Security deductions of $1,049.45, insurance of $180.29, a 401(k) contribution of $196.52, a 401(k) loan repayment of $181.61, a "stock purchase" of $196.52, and "uniforms" of $47.67, the Debtor has net monthly take home pay of $2,078.11. Schedule J reflects $1,829.00 in monthly expenses, and net monthly income of $249.11. Schedule J indicates that the Debtor has no rent or mortgage payment. Rather, it states: "Debtor lives with boyfriend and he pays all rent."

The Debtor's Form B22A shows a household size of one person and current monthly income ("CMI") of $3,930.16. The Debtor's annualized CMI of $47,161.92 was above the applicable median family income of $38,784.00 for a household of one. Form B22A shows negative monthly disposable income of $589.22, and the Debtor maintains that there is therefore no presumption of abuse under Section 707(b)(2) of the Bankruptcy Code.

The Debtor's schedules do not include any information regarding the income and expenses of the Debtor's boyfriend. No monetary contribution by the boyfriend was shown other than the notation in Schedule J that "he pays all rent."

At the Debtor's 341 meeting, held on March 29, 2010, the Debtor testified that the expenses shown on her Schedule J include all of the household expenses for her and her boyfriend, except for the mortgage payment. At the 341 meeting, the BA inquired into the boyfriend's employment, but

---

[1]The condominium is worth $90,000.00 but is encumbered by liens totaling $98,528.36.

2

the Debtor objected on relevance grounds and refused to answer the question.[2]

On May 28, 2010, the BA filed the motion to dismiss under Section 707(b)(1) and (b)(3). After conducting discovery, on September 2, 2010, the parties stipulated to the following facts:

1)	The Debtor filed a chapter 7 petition for bankruptcy relief on February 26, 2010.
2)	The Debtor's debts are primarily consumer debts.
3)	Pursuant to section 707(b)(7), the Debtor's Current Monthly Income is $3,390.
4)	The Debtor is single with no dependents.
5)	The Debtor moved to North Carolina to take her current job in October of 2005.
6)	When the Debtor moved to North Carolina, she purchased a townhouse at 25 Sidney Marie Court, Greensboro, NC.
7)	In October of 2008, the Debtor realized she could not continue to afford the townhouse and

---

[2]Under the broad scope of inquiry applicable to the examination of a debtor at the first meeting of creditors, the Debtor's objection to the relevance of the question and the subsequent refusal to answer were improper. Rule 2004(b) provides that an "examination of an entity under this rule or of the debtor under § 343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b) (emphasis added). Therefore, the scope of a typical Rule 2004 examination applies to a debtor's examination at his or her meeting of creditors.

The scope of a Rule 2004 examination is broader than the scope of a deposition under Rule 26 of the Federal Rules of Civil Procedure. In re Southeastern Materials, Inc., No. 09-52606, slip op. at 3 (Bankr. M.D.N.C. December 10, 2010) (2010 WL 5128608); see also In re Duratech Indus., Inc., 241 B.R. 283, 289 (E.D.N.Y. 1999) (finding that the scope of a 2004 examination is "exceptionally broad" and noting that it had been compared to a "fishing expedition"). The income and employment of the Debtor's boyfriend, with whom the Debtor resides and shares expenses, is clearly within the scope of the examination because it relates to the Debtor's affairs and her financial condition, and may affect the administration of the estate.

Moreover, the objection on "relevance" grounds was not a proper objection in the context of a Section 341 meeting. A relevance objection invokes Rule 402 of the Federal Rules of Evidence, which provides that "[e]vidence which is not relevant is not admissible." Fed. R. Evid. 402. However, a Section 341 meeting is not a proceeding before the court and therefore is not governed by the Federal Rules of Evidence. Fed. R. Evid. 101. In fact, the court is prohibited from presiding at or attending the meeting of creditors. 11 U.S.C. § 341. Therefore, the Federal Rules of Evidence do not apply at a Section 341 meeting. Rather, the scope of inquiry is determined by Fed. R. Bankr. P. 2004(b). Even if "relevance" was a proper objection, inquiry into the boyfriend's income meets the low threshold under Rule 401, which only requires the evidence to have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Fed. R. Evid. 401. Thus, the inquiry regarding the boyfriend's employment was proper.

3

       moved out of the townhouse.
8) After moving out of the townhouse, the Debtor placed the townhouse on the market to sell. The Debtor has not been able to sell the townhouse. The Debtor is surrendering the townhouse.
9) To help cover expenses, the Debtor was able to rent the townhouse for enough to cover the mortgage from approximately October 2008 until October 2009.
10) The Debtor moved in with her boyfriend in October of 2008.
11) The Debtor's boyfriend is currently employed.
12) The boyfriend is purchasing the house in which he and the Debtor are living. The Debtor is not liable on the note. The Debtor is not on the deed or the Deed of Trust.
13) The mortgage payment on the property is $1,200 per month.
14) The Debtor has investigated the cost for her to rent an apartment and has found that the average rent for an apartment that would meet her needs is $700.00 per month.
15) The Debtor and her boyfriend agreed that each would pay one half of the expenses of living together.
16) The current average combined utilities, food and mortgage is as follows:

| | |
|---|---|
| Mortgage on current residence | $1,200 |
| Food/household goods | $ 400 |
| Electric/gas | $ 250 |
| Television | $ 140 |
| Internet | $ 35 |
| Water | $ 35 |
| Phone | $ 95 |
| Total | $2,155 |
| Debtor's ½ | $1,077.50 |

17) For simplicity of record keeping the Debtor pays the utilities and buys food and household goods for both of them. The boyfriend pays the mortgage. The result is that the Debtor is responsible for paying approximately $955 per month, and generally does so.
18) The Debtor and her boyfriend have no joint financial accounts.
19) The Debtor and her boyfriend have no joint debts.
20) The Debtor and her boyfriend have not cosigned or guaranteed any debts of the other.
21) The Debtor and her boyfriend file separate tax returns.
22) All other expenses on Schedule J as filed by the Debtor are accurate as of the date of the filing of the petition. The rent, food and utilities entries reflect the Debtor's actual expenses, based on her agreement with her boyfriend. Therefore, she has no rent or mortgage payment, but food and utilities expenses for the both of them.
23) The amounts indicated on the Debtor's filed Schedule I are accurate for the Debtor individually, as of the date of the filing of the petition.

Stipulation, ECF No. 28 (September 2, 2010).

On September 24, 2010, the BA filed a Motion for Summary Judgment, seeking entry of summary judgment solely on the issue of household size. On that same date, the Debtor filed a

Motion for Summary Judgment on the same issue. On October 7, 2010, a hearing was held, and the Court took both matters under advisement.

On December 7, 2010, the parties submitted a letter to the Court, indicating that both parties agreed that the "economic unit" test was the appropriate test to determine household size. Stipulation, ECF No. 40 (December 7, 2010). They agreed that "[w]here there are more shared expenses and/or income, it is more likely that those persons constitute a household, and the converse is equally true." Id. However, they disagree as to the result of the application of the "economic unit" test to the facts of this case. The BA argues that the Debtor's household size is two persons, while the Debtor maintains that it is only one.

### III.  STANDARD FOR SUMMARY JUDGMENT

The standard for summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which is made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure. Rule 56 provides that the moving party will prevail on a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970). When considering a motion for summary judgment, a court is required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), cert. denied, 513 U.S. 813 (1994). The moving party has the burden of establishing that there is an absence of any genuine issue of material fact, and all reasonable inferences must be drawn in favor

of the nonmoving party.  Celotex, 477 U.S. at 323.

## IV.  DISCUSSION

The sole issue before this Court is whether the Debtor has a household of one person or two.[3]  To decide this matter, the Court must determine the meaning of the word "household" as it appears in the Bankruptcy Code.

**A.  The Statute**

"The starting point in discerning congressional intent is the existing statutory text." Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004).  "It is well established that 'when the statute's language is plain, the sole function of the courts-at least where the disposition required by the text is not absurd-is to enforce it according to its terms.'" Id. (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000)).  Therefore, the Court will begin by reviewing the relevant statutory language.

Section 707(b)(1) provides that "[a]fter notice and a hearing, the court . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter."  11 U.S.C. §

---

[3]Both motion for summary judgment focus on the issue of household size, but some ancillary issues, related to the how the Form B22A should be calculated, were argued at the hearing and in the Debtor's brief.  These issues are not currently before the Court.  The parties' December 7 letter reflects that they agree as to how to treat the boyfriend's income for purposes of completing Form B22A, if he is to be included as a member of the Debtor's household.  While the Court is inclined to agree with the parties' statement that there should be "no difference between the treatment of married and unmarried persons in a household," it does not rule on these issues because they are outside the scope of the motions for summary judgment.  If the parties disagree about the proper way to complete the Form B22A calculations in this case, they may make their disagreement the subject of further pleadings.

707(b)(1). Section § 707(b)(2)(A)(I) provides a presumption of abuse if a numerical test is met.[4] If not, then Section 707(b)(3) provides two alternative bases for finding abuse–if the debtor filed the petition in bad faith, or if the totality of the circumstances of the debtor's financial situation demonstrates abuse. 11 U.S.C. § 707(b)(3).

Section 707(b)(6) restricts the ability to file a Section 707(b) motion to the judge, the United States Trustee, or the Bankruptcy Administrator "if the current monthly income of the debtor, or in a joint case, the debtor and the debtor's spouse, as of the date of the order for relief, when multiplied by 12, is equal to or less than" the median family income of the applicable state for a certain sized "household." 11 U.S.C. § 707(b)(6).

Finally, Section 101(10A) provides that for the vast majority of debtors, the term "current monthly income" means the average monthly income from all sources that the debtor receives during the 6-month period ending on the last day of the calendar month immediately preceding the commencement of the case.[5] Subsection (B) provides that current monthly income

> includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the <u>household</u> expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent) . . . .

11 U.S.C. § 101(10A)(B) (emphasis added).

**B. Statutory Construction**

---

[4]"In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of– (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $7,025, whichever is greater; or (II) $11,725." 11 U.S.C. § 707(b)(2)(A)(I).

[5]If the debtor does not file schedule I, then the 6-month period is determined by the court. 11 U.S.C. § 101(10A)(A)(ii).

Although the word "household" appears in several sections of the Bankruptcy Code, no definition is provided. Therefore, the Court must determine its meaning. In doing so, the Court will apply well-established rules of statutory construction.

While it is plain that the means test should be applied based on the size of a debtor's "household," the meaning of the word "household" is not plain from the statutory language. When a word is not defined, a court should apply its ordinary meaning. Perrin v. U.S., 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."); see also Smith v. U.S., 508 U.S. 223, 229 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.").

In determining the ordinary meaning of a word, a court should not consider the term in a vaccuum. The word must be considered in light of the statutory context in which it operates. As the Supreme Court noted, "[l]anguage, of course, cannot be interpreted apart from context. The meaning of a word that appears ambiguous if viewed in isolation may become clear when the word is analyzed in light of the terms that surround it." Smith v. U.S., 508 U.S. at 229.

**C. Three Approaches to Determine Household Size**

Courts have taken three approaches to determining a debtor's household size. The "heads on beds" approach uses the Census Bureau definition, and includes any individuals occupying the debtor's housing unit. The IRS dependency approach limits household size to only those individuals who the debtor can claim as a dependent on his or her tax returns. The "economic unit" approach includes any individuals living in the same economic unit as the debtor.

    **1. The Heads on Beds Approach**

Courts that follow the "heads on beds" approach use the Census Bureau's definition of household, which provides that "[a] household includes all the persons who occupy a housing unit." U.S. Census Bureau, Current Population Survey (CPS) - Definitions and Explanations, http://www.census.gov/population/www/cps/cpsdef.html. The Census Bureau provides that "[a] household includes the related family members and all the unrelated people, if any, such as lodgers, foster children, wards, or employees who share the housing unit." Id. A handful of courts follow the Census Bureau or "heads on beds" approach. See In re Epperson, 409 B.R. 503, 507 (Bankr. D. Ariz. 2009); In re Bostwick, 406 B.R. 867, 872-73 (Bankr. D. Minn. 2009); In re Smith, 396 B.R. 214, 217 (Bankr. W.D. Mich. 2008); In re Ellringer, 370 B.R. 905, 910-11 (Bankr. D. Minn. 2007).

The Ellringer court held that since Section 101(39A)(A) defines "median family income" by reference to the Census Bureau's calculations, the Census Bureau's definition of household should be used for the means test. 370 B.R. at 910-11. It found that this approach "ensures that a household in the means test will have the same number of members as the calculation of median family income." Id. The court noted that Congress could have limited households to family members by using the word "family" instead of "household." Id. Similarly, the Bostwick court noted that the Census Bureau considers whether the house "'is occupied or intended for occupancy as separate living quarters; that is, when the occupants do not live and eat with any other persons in the structure and there is direct access from the outside or through a common hall.'" 406 B.R. at 873 (quoting U.S. Census Bureau, Current Population Survey (2008), http://www.census.gov/population/www/cps/cpsdef.html).

No familial relationship is necessary under this broad test. In Smith, the court found that absent a Congressional mandate to the contrary, it had to apply the plain meaning of the term

"household." 396 B.R. at 216 (citing Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts-at least where the disposition required by the text is not absurd-is to enforce it according to its terms."); Lamie v. United States Trustee, 540 U.S. 526, 534 (2004); Union Bank v. Wolas, 502 U.S. 151, 158 (1991)). Smith, referencing Webster's Third New International Dictionary (1986), found that "household" can either mean all persons residing in a particular structure, or it can indicate a familial relationship. Id. Smith pointed to Section 522(d)(3), which uses the words "family" and "household" differently, and concluded that it was proper to follow the Census Bureau definition of household. Id. at 217. It held that household "means all persons, related or not, who reside in the same housing unit as does the debtor." Id.

The Smith court rejected the "economic unit" approach utilized in In re Jewell, 365 B.R. 796 (Bankr. S.D. Ohio 2007), which is discussed below. Smith found that although the "heads on beds" approach could lead to results inconsistent with the purpose of the means test, "the inconsistency Jewell fears does not lead to an absurd result and it is only absurdity that can excuse straying from a statute's otherwise plain meaning." Id. at 218. Therefore the court concluded that it had "no choice but to accept the common meaning of 'household' and the 'heads on beds' approach it engenders." Id.

### 2. The IRS Dependency Approach

The Internal Revenue Manual approach defines "household" as the people who could be or are included on the debtor's tax return as dependents. See In re Law, No. 07-40863, slip op. at 2-8 (Bankr. D. Kan. April 24, 2008) (2008 WL 1867971) (applying the IRS dependency test, and rejecting alternative approaches); In re Redley, No. 07-11534DW, slip op. at 3 n.10 (Bankr. E.D.

Pa. February 28, 2008) (2008 WL 597947) (applying the IRS dependency test because it was espoused by the debtor, and not contested by the U.S. Trustee, but noting that there was some support in the caselaw for a broader definition of "household"); In re Duncan, 201 B.R. 889, 897 (Bankr. W.D. Pa. 1996) (applying the IRS dependency test).

### 3. The Economic Unit Approach

In terms of its breadth, the third approach falls between the first two approaches. This approach, which the Court will call the "economic unit" approach, asks whether the individuals in the house are acting as a single economic unit. Thus, a household will include individuals who are financially dependent on a debtor, individuals who financially support a debtor, and individuals whose income or expenses are inter-mingled or interdependent with a debtor.

Courts following this approach have rejected the "heads on beds" approach as inconsistent with the purpose of the means test. Herbert involved a debtor who claimed a household size of eleven that included a girlfriend and non-biological children. 405 B.R. 165, 166-67 (Bankr. W.D.N.C. 2008). It held:

> While this court agrees with the Ellringer court to the extent it recognizes that there will be instances in which unrelated, non-dependent individuals should be treated as part of a household, the "heads on bed" approach adopted by that court is too broad because it includes anybody who may be residing under the debtor's roof without regard to their financial contributions to the household or the monetary support they may be receiving from the debtor. Neither does it take into consideration their dependency or relationship to the debtor. On the other hand, the court declines to adopt the standards of the Internal Revenue Manual [that would require the debtor to actually claim the individual as a dependent] for purposes of determining household size because they do not account for the situation in which a debtor may be supporting an individual without declaring that person as a dependent on his tax return.

Id. at 169. The Herbert court noted that "debtors have a variety of different living arrangements that defy being pigeonholed into a neat formula for purposes of defining household size." Id. It held that

it would determine household size on a case-by-case basis, "with key considerations being the debtor's history of support of a household member as well as the debtor's good faith." Id. Ultimately, the court allowed the household size of eleven because the debtor was supporting the girlfriend, their daughter, and her eight children. Id. at 170.

Jewell similarly rejected the "heads on beds" approach because including an individual not supported by the debtor "for purposes of calculating the applicable median family income and disposable income would give rise to a faulty calculation and would result in an inaccurate figure for both." In re Jewell, 365 B.R. 796, 800 (Bankr. S.D. Ohio 2007). It found that "the purpose for which the Bureau of the Census determines a household is radically different (i.e., determining the number and demographics of those residing in particular areas of the United States) and bears no relationship to the purpose of the Official Form B22A." Id. Jewell rejected the IRS dependency approach as too narrow, and noted that while "the purpose of the Internal Revenue Code is to create income for the government . . . [the] policy of the Bankruptcy Code is to provide the honest but unfortunate debtor with a fresh start." Id. at 801. In Jewell, the debtors lived with their two dependent children, an adult daughter and her three children, and an adult son. The court found that the debtors supported their adult daughter and her children by "providing a home, food and other necessities . . . as well as providing funds . . . for gas and medical expenses." Id. The court also noted that the adult daughter likely shared the benefits of her food stamps with the debtors and that there was "no evidence that the [debtors or their daughter] intended the living arrangement to be only temporary, or that the group did not function as an economic unit." Id. at 801-802. Therefore, the court found that the adult daughter and her children were part of the household. Id. However, the court did not include the adult son within the household since he was "merely a head on a bed"

who did not share his income or receive financial support from the debtors, and he paid his own expenses. Id. at 802.

**D. The Economic Unit Approach Is the Correct Approach**

This Court agrees with the approach taken in Herbert and Jewell. The "heads on beds" test is not consistent with the purpose of the means test, which is to determine whether the presumption of abuse arises and whether a debtor has disposable income to pay a dividend to unsecured creditors in a Chapter 13 case. The process of determining a debtor's disposable income by subtracting allowable deductions from the debtor's current monthly income would be derailed if the debtor's "household" included individuals who operate as separate economic units. For example, the deduction for food, clothing and other items in Line 19A is determined by the IRS national standard for the debtor's applicable household size. If the debtor's household includes an individual who purchases these items from his own separate income, and contributes nothing to the debtor's household for these items, then the deduction will include an unwarranted extra amount that would otherwise be part of the debtor's disposable income. This same problem arises whenever the amount of a deduction is determined by the debtor's household size, such as in Line 19B (health care expenses), Line 20A (non-mortgage housing and utilities expenses), and 20B (mortgage/rent expense). Moreover, the "heads on beds" approach potentially skews the outcome of the means test by allowing individuals who share no economic nexus with the debtor to artificially raise the applicable median family income, which acts as a threshold in determining whether the remaining line-item deductions in Form B22A will be used in determining the debtor's disposable income.

Smith acknowledged that the "heads on beds" approach was inconsistent with the purpose of the means test but held that it was bound to apply that approach because it reflected the plain

13

meaning of the term "household." This argument is flawed. The term "household" is not defined in the Code, and the meaning of an undefined term should be "analyzed in light of the terms that surround it." 508 U.S. at 229. The fact that several courts have arrived at different conclusions regarding the meaning of "household" reveals that the term lacks a readily-apparent plain meaning.[6]

The IRS dependency approach is similarly flawed. It appropriates the definition of "household" from a completely different statutory framework, inconsistent with the objective of the means test. The purposes underlying the Internal Revenue Code and the Bankruptcy Code are quite divergent. The Internal Revenue Code is designed to collect tax revenue for the government, while the means test in the Bankruptcy Code is designed to determine a debtor's disposable income. As noted in Herbert, the IRS dependency approach fails to take into account some individuals who may receive support from the debtor, or provide support to the debtor, which leads to skewed calculations of the debtor's disposable income.

The "economic unit" method of defining household size is consistent with the statutory language surrounding the term. This Court, like all courts, encounters debtors with many types of living arrangements. Regardless of any unique, novel, or unexpected living arrangement involved, the economic unit approach is consistent with the goal of the means test to determine a debtor's disposable income. Household size should not be determined by reference to the Census Bureau's definition, the Internal Revenue Manual's definition, familial relationship, sexual relationship, or

---

[6]As Judge Pamela Pepper noted, addressing a different issue under Section 707(b), if statutory language is "so plain, so clear, so unambiguous, that the Court need look no further to determine its meaning . . . then how could six courts have interpreted it one way and five courts have interpreted it in exactly the opposite way? Doesn't the concept of 'plain' meaning carry with it the implication that the same meaning would be 'plain'–ordinary, literal and obvious–to every reader?" In re Sawdy, 362 B.R. 898, 904 (Bankr. E.D. Wis. 2007), vacated and remanded, 384 B.R. 199 (E.D. Wis. 2008).

any other externally appropriated definition that at best only sometimes fits within the statutory framework of the means test. Therefore, this Court holds that household size should be determined by including those individuals who operate as a single economic unit with the debtor.

**E. The Application of the Economic Unit test to the Facts of this Case**

In applying the economic unit test, the Court will consider all the facts and circumstances on a case-by-case basis. Such factors include: 1) the degree of financial support provided to the individual by the debtor; 2) the degree of financial support provided to the debtor by the individual; 3) the extent to which the individual and the debtor share income and expenses; 4) the extent to which there is joint ownership of property; 5) the extent to which there are joint liabilities; 6) the extent to which assets owned by the debtor or the individual are shared, regardless of title; and 7) any other type of financial intermingling or interdependency between the debtor and the individual. In short, the Court will consider whether the debtor and the individual are part of the same economic unit.

Under the stipulated facts in this case, the Debtor's boyfriend is part of her household. The Debtor resides in the boyfriend's house. Although the boyfriend has sole title to the house, he shares the house with the Debtor. The boyfriend pays the mortgage on the house, which constitutes financial support of the Debtor. The Debtor pays for food, utilities, and household goods for herself and her boyfriend, which constitutes financial support of the boyfriend. The lack of any joint debt or joint financial accounts does not persuade the Court that the Debtor and her boyfriend should be treated as separate households, nor does the fact that the Debtor and her boyfriend file separate tax returns. The Debtor and her boyfriend share a significant amount of their income and expenses, and the Court concludes that they constitute a single economic unit.

## V. CONCLUSION

For the above reasons, this Court holds that the word "household" under the means test includes a debtor and those individuals who operate as a single economic unit with the debtor. In this case, the Debtor and her boyfriend operate as a single economic unit, sharing a significant amount of their income and expenses, providing each other with financial support, and sharing the use of assets. Pursuant to the stipulated facts, viewed in the light most favorable to the Debtor, the Court concludes that the Debtor has a household size of two persons. Accordingly, the BA's Motion for Summary Judgment will be granted, and the Debtor's Motion for Summary Judgment will be denied.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| WENDY MARIE MORRISON, ) | CASE NO. 10-10365 |
| ) | |
| ) | |
| Debtor. ) | Chapter 7 |
| ) | |

**PARTIES IN INTEREST**

J. Marshall Shelton, Esq.

Erik M. Harvey, Esq.

Wendy Marie Morrison

Robert E. Price, Jr., Esq.

Michael D. West, Bankruptcy Administrator

Everett B. Saslow, Jr., Chapter 7 Trustee